HBRQGADc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA
3
                    v.                          17 MJ 8611 (WHP)
4                                               Bail Hearing
    CHEIKH GADIO
5
                        Defendant
6   ------------------------------x

7                                               New York, N.Y.
                                                November 27, 2017
8                                               3:05 p.m.

9
    Before:
10
                        HON. WILLIAM H. PAULEY III
11                                              District Judge

12
                            APPEARANCES
13
    JOON H. KIM
14       Acting United States Attorney for the
         Southern District of New York
15  DANIEL RICHENTHAL
    DOUGLAS ZOLKIND
16       Assistant United States Attorney

17  DEBEVOISE & PLIMPTON LLP
         Attorneys for Defendant Gadio
18  SEAN HECKER
    SARAH WOLF
19
    -also present-
20
    JOHN MOSATO, PRETRIAL SERVICES (SDNY)
21  SOPHIE PIERSON, Interpreter (French)

22

23

24

25

2

HBRQGADc

1            (In open court; case called)

2            THE DEPUTY CLERK:  Appearances.

3            MR. RICHENTHAL:  Good afternoon, your Honor.

4            Daniel Richenthal and Douglas Zolkind for the

5    government.

6            THE COURT:  Good afternoon, Mr. Richenthal.

7            MR. HECKER:  Good afternoon, your Honor.

8            Sean Hecker and Sara Wolf from Debevoise & Plimpton

9    for Dr. Gadio.

10           THE COURT:  Good afternoon to you, Mr. Hecker.

11           I note the presence of a French interpreter

12           THE INTERPRETER:  Yes, your Honor.

13           THE COURT:  Would you identify yourself for the

14   record.

15           THE INTERPRETER:  Yes, your Honor.

16           Sophie Pierson, P-I-E-R-S-O-N, French court

17   interpreter consultant to the courts.

18           THE COURT:  Good afternoon to you, Ms. Pierson.

19           Are you a certified court interpreter?

20           THE INTERPRETER:  Yes, your Honor.  I'm certified by

21   the State of New York and the State of New Jersey as well as

22   the Department of States.

23           THE COURT:  Very well.

24           Mr. Gadio --

25           MR. HECKER:  May we have one moment, your Honor?

HBRQGADc

1      THE COURT:  Yes.  I note the presence of the

2  defendant, Mr. Gadio, at counsel table.

3      Mr. Gadio, are you able to understand what's being

4  said here this afternoon through the French interpreter?

5      THE DEFENDANT:  Yes.  Yes, your Honor.

6      THE COURT:  Very well.  Good afternoon, sir.

7      All right.  Mr. Richenthal, what is the status of this

8  matter?

9      MR. RICHENTHAL:  Your Honor, we're here on the

10  government's appeal of a determination by Magistrate Judge Fox

11  that Mr. Gadio should be released if and when he meets certain

12  conditions as set forth in our letter dated today, November 27,

13  2017.

14      I'm not going to go over everything in our letter.  We

15  don't appeal quickly or easily or even routinely.  We do it

16  where we think there's a real risk of flight or dangerousness;

17  in this case, flight.  And we think the risk here is severe for

18  the reasons set forth in our letter and the reasons set forth

19  in the original bail argument.

20      That does not mean that Mr. Gadio will flee.  No one

21  can predict the future.  It doesn't mean he's a bad person.

22  We're not impugning his character.  People flee and they flee

23  for rational reasons, and the record of this case in multiple

24  ways leads to the firm conclusion on our part that the risk is

25  severe; that the resources that to do so exist; and that were

HBRQGADc

1     he to flee successfully, we'll never get him back.

2             And that's why we're here to appeal, which we don't

3     routinely do, because we simply think, as we put forth in our

4     letter, there is no set of conditions that can reasonably

5     assure his conditions to face these serious charges.  I'm happy

6     to go forward and describe the reasons in more detail, but I'm

7     sure the Court has read the letter and the prior proceeding.

8             I'm happy to answer any questions the Court may have.

9     We think that risk is manifest, and we think detention is the

10    only appropriate outcome on the facts of this case and the

11    record.

12            THE COURT:  Mr. Hecker.

13            MR. HECKER:  Yes, your Honor.  Thank you.

14            I think what may make sense at this point is for me to

15    address a couple of the critical elements of what the

16    government has suggested to the Court because I'll say flatly

17    that Dr. Gadio has every intention of confronting this case

18    here in the United States where he has very substantial ties.

19    The government has very dramatically overstated its argument

20    that Dr. Gadio doesn't have ties to this country.

21            This man lived for a decade in Ohio.  He got a Ph.D.

22    from Ohio State University.  His wife has owned this home in

23    Maryland, the family home, in the United States since 2002.  No

24    one else has lived there.  The government suggested in prior

25    bail hearings they don't know who lives there, maybe it's

HBRQGADc

1    rented out, maybe he couldn't live there.  He can live there.

2    That's where he comes; that's where he stays in the United

3    States.

4              He's a lawful permanent resident of the United States

5    which Magistrate Judge Fox correctly identified as a

6    substantial tie to this country, and he was only here at the

7    time of his arrest in order to ensure that his status as a

8    lawful permanent resident continued.

9              Key to the government's argument here is that if

10   Dr. Gadio somehow got additional travel documents and made his

11   way to Senegal, that it would be difficult for them to get him

12   back, but that is based on a completely false premise.  The

13   government says in its letter that nothing would stop him from

14   getting additional travel documents.  That's false.

15             The conditions set by Magistrate Judge Fox would

16   prevent him from seeking any additional travel documents.  And

17   where would he get them?  He'd get them from the consulate.

18   The Consulat General from the Senegal Consulate in New York is

19   here today in court -- El Hadji Amadou NDAO.

20             Do you mind standing, sir?

21             (Complies)

22             MR. HECKER:  This is a gentleman who is appointed to

23   that position by the president of Senegal.  He has authorized

24   me to inform the Court that the president of Senegal, all of

25   the members of Congress, where my client is a current member of

HBRQGADc

1    the legislature in Senegal, support this gentleman.  He's a

2    well-known figure there.  He has brokered peace agreements with

3    three different Secretaries of State of the United States.

4    This is a man of honor, of deep, well-deserved reputation.  He

5    has every intention of confronting these charges here.

6            The notion that the government of Senegal is going to

7    conspire with him to feed him travel documents he's not

8    entitled to get, secrete him off to Senegal, and have him live

9    in exile is totally baseless.

10           I went to the State Department website because I

11   wanted to see what is the status of the United States'

12   relationship with Senegal.  I pulled up a fact sheet dated

13   June 30, 2017.  It reads:  The United States established

14   diplomatic relations with Senegal in 1960 following its

15   independence from France and the dissolution of the Mali

16   Federation.

17           Senegal has had three presidents from 1960 to 2012.

18   Senegal is an unwavering partner of the United States in

19   promoting peace and security in Africa.  The last three

20   presidents of the United States visited Senegal.  This is a

21   country with deep, deep relationships with the United States

22   including as a partner in fighting terrorism in Africa.  This

23   is not some rogue state that is going to secrete one of its

24   members of the legislature out of the country and keep him in

25   hiding in Senegal.  He is a well-known gentleman all around the

HBRQGADc

1    world.

2              THE COURT:  Does Senegal have an extradition treaty

3    with the United States?

4              MR. HECKER:  It does not, your Honor.  So it is true

5    that if this gentleman or any defendant made their way to

6    Senegal, it would be difficult to extradite them.  But the

7    issue is how would he get there.

8              The bail conditions set by Magistrate Judge Fox, which

9    are dramatically more restrictive than pretrial services

10   recommended here, include home detention with GPS monitoring, a

11   condition he's prepared to live with.  If he were to go to the

12   consulate or someone were to come to him, he would be in

13   violation of the conditions set by Magistrate Judge Fox.  That

14   would be unlawful.  He is not going to do it.

15             And, look, it is undoubtedly a very long complaint.

16   It's 55 pages long.  A third of it relates to a conspiracy, in

17   which my client is not charged and he's not a part of, relating

18   to Uganda.  The rest is long.  They've cut and pasted from a

19   number of email in relation to my client's efforts to broker a

20   relationship between a Chinese oil and gas company and the

21   government in Chad.  There are defenses here and I want to be

22   very clear about that.  The facts are not so straightforward.

23             My client, when he was arrested, gave a lengthy

24   interview.  He answered investigators' questions giving every

25   indication that he's prepared to confront these charges.  He

HBRQGADc

1    did not seek to avoid that conversation.  The facts will come

2    out.  We will have a chance to tell our side of the story.  We

3    have not seen this videotaped testimony.  I think the

4    government was very careful in how they framed what was said;

5    that he confirmed certain facts.  Sure, he confirmed certain

6    facts.  He did broker a meeting with the president of Chad and

7    a company seeking to do business in Chad, but he denied any

8    intent to corrupt the president of Chad, and for good reason;

9    and so his mindset is of someone who is innocent and prepared

10   to address these charges.

11           The question for the Court is, can it really accept

12   the government's position that there are no conditions of bail

13   that can reasonably assure his appearance in court?  The issue

14   isn't eliminating any metaphysical possibility that he could

15   flee, and they couldn't get him back.  It's, are there

16   conditions that reasonably assure his appearance in court, and

17   we respectfully submit that the bail package here is quite

18   restrictive; frankly, more restrictive than is necessary for

19   him to confront these charges, and he has every intention of

20   doing that.

21           MR. RICHENTHAL:  Your Honor, it's true that Mr. Gadio

22   had connections to the United States.  Those ceased a very long

23   time ago.  Mr. Gadio's connections to Vermont and other places

24   have not existed for well over a decade.  He doesn't live here.

25   He comes here for less than two weeks a year.  Those are just

HBRQGADc

1    the facts of this case.

2          His entire personal life, his entire professional

3    life, his entire family, they all reside abroad, principally in

4    a country with which he we has no extradition.  Senegal is not

5    remotely a rogue state.  This is not about Senegal.  It's about

6    Mr. Gadio and the meeting to which Mr. Hecker referred, I would

7    refers your Honor to pages 24 and 25 of our complaint which

8    describes what Mr. Gadio said in his own words, which is that

9    meeting and the $2 million offer was to "reward him" -- him

10   being the president of Chad -- "with a nice financial package

11   as an entry ticket in the Chadian oil market and later gas

12   market and other key business opportunities."  That's what

13   Mr. Gadio said about his own meeting.

14         Finally, let me note that it's true that the package

15   that pretrial services ordered was different from what

16   Mr. Gadio sought and different from what we sought, but it's

17   sadly also true that pretrial didn't have full information.

18   They didn't know the defendant had with his wife more than

19   $700,000 in a bank account.  That's not in the report.  They

20   didn't know the defendant had founded and operated a consulting

21   firm through which he received fees for bribery.  That's not in

22   the report.  He left out his employment there.

23         So the report is valuable as far as it goes but,

24   unfortunately, meaningful things aren't in it, things that are

25   probative of Mr. Gadio's resources, probative perhaps of his

1    mental state, at least on the day of his arrest, and probative

2    of the decision that this Court needs to make.  The reality is

3    this is a man with no connection to the United States other

4    than he has the lawful right to be here, at least for now, and

5    he, or, more accurately, his wife owns real property that

6    neither he nor his wife nor anyone in his family has lived in

7    for a very long time which forms only a minority of his assets.

8    The rest?  It's not the property, and there's all kinds of

9    assets abroad that we neither have insight into nor the ability

10    to restrain.

11            Even if it were true that no one in Senegal wanted to

12    help Mr. Gadio, and I don't mean the government, I mean no one

13    in Senegal wanted to help Mr. Gadio, even if one were to

14    stipulate that -- it's not clear one should but even if one

15    were to -- Chad and Uganda played roles here.  There are people

16    in those countries that would have an incentive to help

17    Mr. Gadio, and a massive Chinese energy conglomerate with

18    resources which are almost unimaginable would have every

19    incentive to help Mr. Gadio and every ability to do it, and

20    there is little to no insight that we have, at least in

21    realtime, as to whether that's happening.  If Mr. Gadio is

22    sitting in real property in Maryland, nothing stops people from

23    helping him other than an order of the Court which is valuable,

24    no doubt, but doesn't really prevent what we're trying to

25    prevent.

HBRQGADc

1          As we said when Mr. Gadio was first presented, as we

2     said in our papers, and as we say today, this is not a knock on

3     him personally.  It doesn't mean he will flee.  It's an

4     assessment of the facts, and the facts are we have a foreign

5     national with extraordinarily high-level connections in

6     multiple countries all over the world, including his own, with

7     little to no connection to the United States with resources to

8     flee, with people who have every incentive to help him flee,

9     who is comfortable traveling all over the world, as is plainly

10    true from his cell phones to his SIM cards to his travel

11    history, whose only reason to remain would be not to lose real

12    property.  No one resides in it in his family.  That's a

13    minority of his assets and to retain, the legal right to be

14    here that he's likely to lose in any event.  That mix of facts

15    in our judgment simply does not warrant bail.

16          MR. HECKER:  Your Honor, if I may.

17          First of all, the $700,000 in an account, his wife has

18    been working for the UN for 15 years.  That's her account.

19          THE COURT:  It turns out his name is on the account,

20    but he has never used it.  So when he didn't mention it to

21    pretrial, it was not designed to mislead them about his

22    family's resources or anything remotely like that, and the

23    government knows that because they've heard that already.

24          Second, it is instructive about who stepped forward to

25    sign a million dollar bond putting themselves on the hook if

HBRQGADc

1    this gentleman does not return to court.  Because since the

2    time of the initial detention hearing, the government has

3    approved four cosigners of this million dollar bond.  So when

4    the government says there are no consequences other than his

5    wife's house, it's not limited to his wife's house, the

6    $250,000 in his wife's house.  His wife has signed the bond.

7    She's a respected member of the UN community.

8            Additional cosigners include his brother-in-law,

9    Dr. Louis Kamara, who would be here today if he wasn't in

10   Maryland filing a confession of judgment on the house with

11   Dr. Gadio's wife.  They were driving up here, but they didn't

12   quite make it.  He's an attorney admitted to practice in

13   Maryland and D.C.  He also has been approved as a cosigner.

14           Mark Chichester, who is in court today.  He is the

15   vice chairman of Atlas Research, which is a Washington-based

16   public sector management consulting firm.  Before that, he was

17   a vice-president of the Aspen Institute.  He has a law degree

18   from George Mason University.  He sits on the board of trustees

19   of George Mason University.  He has known him for two decades,

20   and he's made the judgment that he is prepared to be on the

21   hook for a million dollar bond if he doesn't come back to

22   court.  That is a relationship my client cares quite deeply

23   about.  So when the government says there would be no

24   consequences were he to flee, there would be deep consequences

25   to him personally.

HBRQGADc

1          The ambassador to the United States from Senegal for a

2     decade is here in court today, Ambassador Amadou Lamine Ba.  He

3     studied at Ohio State University and earned a Ph.D. around the

4     same time as my client.  They were classmates at the same time.

5     They've been friends for a long time.  When my client was the

6     foreign minister of Senegal for nine years, Ambassador Ba was

7     the ambassador to the United States, to Mexico and Trinidad and

8     Trivago.  He is here.  He lives and works in Boston.

9          All of these people have put themselves on the line

10     believing that this gentleman will return to court.  There are

11     very significant consequences to them and to my client and his

12     reputation were he not to return to court.  His whole career

13     over many decades tells you that he is someone of integrity who

14     cares deeply about his reputation, and those are very

15     substantial reasons for him to return.

16          I would just say this, the government, the prosecutors

17     in this case, as I understand it, were prosecutors in another

18     case in this district just recently involving allegations of

19     FCPA violations and corruption.  The defendants in that case

20     were not lawful permanent residents.  They were far wealthier,

21     at least the principal defendant, than our client.  That case,

22     over the government's appeal of a detention order, those

23     defendants were out on bail during the pendency of the case.

24     There was more money involved.  There was a very sizeable cash

25     bond of $20 million, and the bond itself, as I understand it,

HBRQGADc

1    was something like 50 million.  Even in that case, where there

2    were far fewer ties to the United States, bail was granted.

3              This case is a far, far stronger case, and I believe

4    the Court has ample reason to conclude that it is a sufficient

5    package to reasonably assure his appearance.  Indeed, we worked

6    with the Maryland County Court to file a confession of judgment

7    for the house today.  It needs to be signed and a filing fee of

8    $165 needs to be paid.  That's likely to happen tomorrow

9    morning, but we are going to urge the Court to modify the bail

10   conditions slightly, to allow Dr. Gadio to be released today,

11   given that the other conditions have been met.  My

12   understanding is pretrial services needs to inspect the home.

13   This is a home where only Dr. Gadio and his family have lived

14   over the last 15 years.  That's where he goes when he comes to

15   the United States, as he has come every year.

16             THE COURT:  Who resides there now?

17             MR. HECKER:  When family members are not living there,

18   no one.  It is kept as their family home.  No one is there.

19             MR. RICHENTHAL:  Just briefly, your Honor.

20             I don't want to make too big a deal of a particular

21   bank account because I think bail rightly rests on an

22   assessment of all facts, not one fact.  But I can hand your

23   Honor the most recent statement we have of this bank account.

24   It shows wires from it to Mr. Gadio himself.  So the assertion

25   that somehow he's not aware of it, has no involvement with it,

HBRQGADc

1    that's false.

2              On September 13, $30,000 was wired to him.  Prior to

3    that, money was also wired abroad.  That's not a surprise

4    because Mr. Gadio's entire family lives abroad.  Specifically,

5    money was wired to London where his daughter was at the time.

6    There is nothing wrong with that.  People send money to family

7    members all the time.  That's not the point.  The point is,

8    this bank account gives you a sense of his resources, a sense

9    of his international travel, and he absolutely was involved in

10   it.  That's a fact of relevance.

11             In terms of the other comments that Mr. Hecker has

12   made, I think some of his factual assertions are correct.  Your

13   Honor has to weigh both sides of this, but ultimately we don't

14   think that is sufficient, because what we're talking about is a

15   situation, as I said, in which the incentive to flee is

16   massive, the ability to do so is massive, and it's true that

17   other people might be on the hook for the bond, but it's also

18   true that there's a massive Chinese energy conglomerate who

19   might well pay them, and we wouldn't know about it.

20             Bail is in part about looking forward.  It's a

21   prediction of what will happen.  I don't have that ability any

22   more than you do, but your Honor is charged with trying to

23   assess the future, assess the likelihood.  Our assessment is no

24   package can reasonably assure this defendant's return to court.

25             Finally, just so your Honor is aware of who we're

HBRQGADc

1    talking about, Mr. Hecker referred to a different defendant in

2    a different case.  I believe he's referring to Ng Lap Seng.

3    Mr. Ng was released over our objection, absolutely.  We think

4    he shouldn't have been.  He was released into the custody of

5    24-hour armed guards, something I think your Honor dealt with

6    in a different case several years ago.  We respectfully took

7    the position that wasn't appropriate and he shouldn't be

8    released into their custody, but he was.

9         Whether it's appropriate, whether or not the law says

10   a court can or should consider it, that's not this package.

11   This package, like virtually any package, requires the Court to

12   place trust in Mr. Gadio.  It's not an assessment of his

13   character.  It's trust in him and those around him that he

14   won't flee.  We don't think that trust is properly placed in

15   light of the rational incentives to flee, the resources to do

16   it, and the undeniable fact that if he goes to Senegal or, for

17   that matter, Chad or Uganda or China, it's not difficult to get

18   him back.  We'll never get him back.

19        THE COURT:  Anything further, Mr. Hecker?

20        MR. HECKER:  No, your Honor, other than to say I've

21   not seen the bank records, but the fact that his wife may have

22   transferred money to him from the bank account is not

23   inconsistent with what I said.  Yet, this was not provided to

24   me until just now.

25        But let me be clear.  My client didn't control the

HBRQGADc

1    bank account.  He didn't view it as his account.  He views it

2    as his wife's account.  That's my only point on that.  And what

3    was described by the prosecutor just now is not inconsistent

4    with that at all.

5            MR. RICHENTHAL:  Just to be clear, he's a signatory on

6    the account.  It's not simply that he received money from it.

7            THE COURT:  Mr. Hecker, you said a few minutes ago

8    that the defendant's wife was in Maryland with the defendant's

9    brother addressing the confession of judgment?

10           MR. HECKER:  What I said, your Honor, is that

11   Dr. Gadio's wife, who is also Dr. Gadio, was in Maryland this

12   morning with his brother-in-law, who is a lawyer, and they were

13   trying to get this document filed.  I was talking to them in

14   the Maryland clerk's office before I came to court today.  They

15   tried to make it up here and didn't get up here all the way in

16   time.  But I believe they're still en route to court now.

17           THE COURT:  Does she plan to remain in the United

18   States during the pendency of this case?

19           MR. HECKER:  I believe that she does, your Honor, and

20   I don't want to make a representation about that unless it's

21   part of the Court's consideration of the circumstances under

22   which you would grant bail.  She has a very significant job

23   working for UN and is stationed over the last number of years

24   in Equatorial Guinea, but she is back in the United States

25   prepared to support her husband, and I believe that if the

HBRQGADc

1    Court made it a condition that she remain here, that that's

2    something that the family would consider doing.

3                THE COURT:  All right.  We will take a brief recess.

4                (Recess)

5                THE COURT:  Having considered the transcript of the

6    proceedings before Magistrate Judge Fox, the criminal complaint

7    in this case, the pretrial services report and the government's

8    letter of November 27, and after further considering the

9    arguments of counsel, I find that the conditions that were

10   fixed by the magistrate judge with some modest adjustment are

11   in my view sufficient to ensure the defendant's attendance at

12   proceedings in this case.

13               It is clear to me that notwithstanding the arguments

14   of counsel, the defendant's connections to the United States

15   currently are very limited.  I place significance in the

16   stature of the individuals who have come forward as guarantors

17   in this matter on the bond.

18               I think that as part of the electronic monitoring, he

19   is going to be confined to the home in Maryland, and when I say

20   "confined," I mean there will be no trips to New York to visit

21   with counsel.  If counsel want to meet with him, you can go

22   down there and meet with him or you can develop a Skype account

23   with him.

24               He is to be accompanied to any court appearance from

25   Maryland by a member of the defense team and returned to the

HBRQGADc

1    house in Maryland by a member of the defense team.  So there

2    will be no trips anywhere.

3          In all other respects, I think that the bail package

4    is sufficient.  However, I would decline the defendant's

5    application to have the defendant released today.  The

6    defendant is not to be released until all of the T's have been

7    crossed and the I's dotted, and that includes all of the

8    details regarding electronic monitoring in Maryland, which I

9    presume pretrial has consulted with your counterparts down

10   there and they are completely prepared to install it and

11   monitor it and implement it.

12         Is that correct, Officer Mosato?

13         OFFICER MOSATO:  That is correct, your Honor.

14         THE COURT:  So the government's appeal is denied, but

15   the bail is modified to incorporate these conditions, and I

16   will issue a short order later today.

17         Is there anything further with respect to this matter

18   at this time?

19         MR. RICHENTHAL:  Not from the government, your Honor.

20         MR. HECKER:  One additional thing, your Honor.

21         I believe there's been some back-and-forth about the

22   preliminary hearing, and at this time the defendant will agree

23   to waive to the 30th day for the government to pursue a

24   preliminary hearing.

25         THE COURT:  All right.  Very well.

HBRQGADc

1          So when the defendant is released, whenever that may

2     be, perhaps tomorrow, he's to be accompanied to Maryland by

3     someone from the defense team, and he is to maintain telephone

4     contact each day with pretrial services here in New York using

5     a landline from the home in Maryland, not a cell phone, and he

6     is to report from that landline at such time each day as

7     pretrial services may direct.  And I'm instructing pretrial

8     services to alter the time of day in which they seek to contact

9     the defendant to ensure that he is present in the residence in

10    Maryland, and I'll include that in the order.

11         MR. RICHENTHAL:  One thing just occurred to me, your

12    Honor.

13         I think different districts sometimes use different

14    terms.  Could your Honor specify that the electronic monitoring

15    contemplated is GPS.  I know districts have different forms.

16    It may be that the district of Maryland interprets ambiguity

17    within their discretion.  We submit it should be in the form of

18    GPS rather than another form.

19         THE COURT:  I'll include that direction.

20         Officer Mosato, do you know whether the Maryland

21    utilizes the GPS system?

22         OFFICER MOSATO:  I believe they do.

23         THE COURT:  If there is any doubt about that, I expect

24    to get a report back by tomorrow morning.

25         Anything further?

HBRQGADc

1              MR. RICHENTHAL:  No, your Honor.

2              MR. HECKER:  No, your Honor.  Thank you.

3              THE COURT:  This matter is concluded.  Have a good

4    afternoon.

5              (Adjourned)